Next case is EasyWeb Innovations v. Twitter, 2016-2066. Mr. Kilman. May it please the Court. Good morning, Your Honors. Mr. Cotignato invented a way of publishing information, personal web pages on the internet, that transformed the way that publishing actually takes place. In the past, there were two ways, he says, to do it in the patent. And everyone agrees with that. The two ways were to have your own technology, your own competence in publishing webs, or you hired someone to do it. That was it. What Mr. Cotignato did was he took the technology that existed at the time that conveyed information, such as telephones, for example, fax machines, email, and he turned those into web publishing tools. He did that in two ways. He used the format of the message, the format of what was coming in by the fax machine, or email, or telephone, to do two things. One is to convert it and put it up on the web, and also to determine where it was coming from, to authenticate the user. Well, obviously, you have two problems, counsel. One is abstract ideas. Yes. And the other is lack of infringement. But you say your client made this nice invention, but it's basically an authentication idea, isn't it? No, I don't agree with that. I agree that authentication is certainly part of what is going on here. But what the invention is about is about taking what didn't exist before, which is a way of publishing on the web, taking tools that were never used in that way before, such as a telephone, or a fax machine, or email, and publishing information on a website. So that itself doesn't have anything to do with authentication. Authentication is a means towards accomplishing that end. In fact, it's one of the specific ways that that's done. What's done is to then take what's coming in, say from the email or whatever it happens to be. That's the preferred embodiment, those examples I'm giving. And then to figure out, OK, who's that coming from, and then convert. All of the technology in the past, the conversion technology that Twitter says was conventional, was not conventionally used for publishing on the web. Telephones weren't. Fax machines weren't. There's no evidence of that in the record. And the conversion software, as well, was used to convert, say, from one image format to another. But it wasn't conventional at the time. Remember, we're going back to the 90s now, the late 90s. It wasn't conventional to use any of that to convert and put things on the web. Yes, individuals could use suites of technology and suites of software. But it's passing information back and forth, isn't it? Well, every computer device passes information back and forth. But that's one of the problems, one of the facts of the present law, as we take it from the Supreme Court. Well, certainly, I agree that this court's precedent is that if all you're doing is taking conventional computer means, conventional computer pieces, and just moving information back and forth, and that's all that's being done, I agree. Then under this court's precedent, there's an Alice problem. But that is not at all what is going on here. What we are doing is changing, in fact, using a particular rule similar to, say, the McGrow case in this court, and saying that I want to authenticate. How do I authenticate? I authenticate in a way that's never been done before, by using the format of what's coming in. So say, in the email context, I might be looking at a From header. Or I might be using another part of the email. In a different context, in the facts context, I'm using what the facts provides. So it could be, say, caller ID. It could be the facts header. Talking about infringement, does Twitter use a first and a second format? I'm sorry? Does Twitter use a first and a second format? I believe that they do, although there's going to certainly be a dispute below over that. If you send it back to the district court, I think there will, in fact, be a dispute over that. Although, that dispute was not part of the court's decision in the case. And it is certainly true that first and second form. You're using the words first and second format in those individual terms. I'm understanding the question, as opposed to just format in general. Because there are two different things going on here. One is, what does the word format mean? And then, what are the first and second formats individually? First and second were not part of the district court's ruling on summary judgment, though the district court did, in fact, construe those terms. I think those will be disputed below. And I'm hoping we're not back again after that happens. But that's why it was in our brief. I had an abundance of caution, so that could be decided here. With respect to the format, let me talk about infringement, which you asked about. Format is used in two different ways in the patent. One kind of format is what we've been calling a file format. It's what the court said. Format is used interchangeably with file format. But the court, I believe, understands that to mean is, say, a JPEG image or a GIF image. Two different ways of coding an image. Yes, conversion does take place in the patent based on that in one circumstance. But there's also conversion from, say, an email, where you're not converting image file formats, and you're taking the way of sending information, in other words, an email wrapper or email packaging, and putting it in web packaging, which is how that is served up and sent up for people to look at. We need to also understand that format plays a very, very fundamental role in the identification scheme, the authentication scheme. Under Twitter's and the district court's construction, there's no way to do the identification scheme. Because in the preferred embodiment, there is no identification or authentication based on whether something's a JPEG or a GIF or any other kind of image format. That's not done. For example, it's done based on the transfer wrapper. So is it an email? Is it a fax? For example, a fax, as Twitter concedes, can come in in an image format. That same image format can be attached to an email. Under the district court's interpretation, because they're in that same format, they both have an attachment associated with them that's an image, they're both going to be authenticated in the same way. But that's not how the preferred embodiment works. The preferred embodiment authenticates fax different from email. So it has to include, if you're going to include the preferred embodiment in the claims, in the meaning of format, we have to embrace having email be different from a fax. And so when you turn to the infringement and what Twitter is doing, what Twitter does is it has three different ways, three different formats of sending the message. It has its web form, where you type in a password and then a cookie is sent. And the cookie is part of that wrapper. It's called an HTT post, but there's a specific field for the web that has a cookie. If you're using their mobile app, and this is all 2013 technology, because that's when this was done, so I don't know how they, today it might be a little bit different, but that's what we're talking about. In the mobile app, it's OAuth, and that's actually a secure token that is used. And it's a totally different field. And with the text messaging, which is the third option that they use, they use a number system there, I'm sorry, a phone number system, where that information is sent in totally different fields. So if we take seriously what the district court and Twitter believes is the definition of field sort of in the dictionary, I'm sorry, the definition of a format in a dictionary sense, which is a collection of information and headers, then that's exactly the argument that we need below, and that's exactly why Twitter infringes, and our expert explains that those different headers make them different formats under our construction, and that's an issue for the jury to decide under what we believe is the correct construction. I can move on to the, if there's any questions on that, I can move on to the central processor as well, which is the other claim construction issue that is important here. And that is central processor in the patent really means computer or computers. Mr. Cottenato himself put together, I was using a shorthand, I mean, we use it, it's a collection of computers, a single computer, a collection of computers in a system, I think is the actual construction that we propose, but essentially it's one or more computers. And the reason, so Mr. Cottenato put this specification together himself many years ago, this is the record show, he used this term central processor, he saw it in many patents, right? And he used that consistently throughout the specification as a central, as a computer or more than one computer, and he explicitly says that as well. What the district court did in this particular circumstance was try to read something into the central processor that is just not there anywhere in the patent. I see I'm in my rebuttal time, if there are any other questions your honor want me to address beforehand, I'll reserve the rest. We will save it for you. Thank you. Ms. Dury. Thank you, your honor, and may it please the court, Daryl and Dury, appearing before Twitter. Let me begin, your honors, with the characterization of the invention. In the specification, the inventor distinguishes his invention over Bobo. This is at page 79 of the appendix. By explaining that while Bobo described a system pursuant to which users could use fax machines or telephones to send messages to be published and to appear on the internet, that Bobo did not provide a security scheme associated with those messages, and so it would be possible, for example, for unauthorized users of the system to use it to put messages in somebody's inbox. Consistently then, with that explanation, the reason for allowance for each of the patents at issue was a security scheme that tied the identification mechanism to the format of the message. And in the specification, it explains that fax, image, and text each have preferred file formats associated with them, and explicitly distinguishes the format of the message that is at issue from such things as headers, packet data, and data descriptors, which are described as being, therefore, other than the format of the message. The consequence of EasyWeb's definition of format is that merely including a different authentication mechanism, for example, an OAuth token versus a cookie, as part of the information that is transmitted along with the message, means that the format of the message is, therefore, different. EasyWeb has not identified any difference in the encoding that is applied to messages that are sent from the app versus messages that are sent from the web browser. They are both in the HTTP post format. The only difference it has identified is that different authentication mechanisms are used for them. And indeed, EasyWeb's expert, Dr. Polish, admitted that in this circumstance, to the extent that these tweets are using different forms of authentication in the forms of cookies versus OAuth tokens, that necessarily means that they are, therefore, in different formats. That reverses the causation that is required by the claims that identification be dependent on format. Not that format... Why don't you tell us why these claims are patent eligible? Yes, Your Honor. These claims are not patent eligible because the idea that is reflected in the claims is this idea of format-dependent authentication. In other words, that the way that you determine who someone is is a function of the format. That is an idea that could be implemented by asking someone who calls into a system to voice identify themselves and asking someone who sends a letter into a system to perform that authentication with a signature. Each of the other components recited in the claims is essentially what EasyWeb contends to be a generic computer, a central processor, which they say is any computer at all, and conventional articles that are described as such in the specification. It is a case we think most like TLI, where the idea here, the allegedly inventive idea, is this abstract concept. And what we have are then generic components that allow that idea to be implemented in the context of the internet. The one thing I am struggling with in your abstract idea analysis, as well as in the lower court's abstract idea analysis, is that you focus exclusively on authentication. In most of the cases we've had, the abstract idea is a means of explaining what the claim as a whole, how it is abstract, or is directed to an abstract idea. But here, while the novelty of the claim potentially is argued to be the authentication scheme, the claim is actually about conversion and publication. So I feel like you have extracted a single element from a multi-element claim, and said, aha, there's an abstract idea in here somewhere. Thus, this meets the Alice test. Most of the other cases, the whole claim is characterized in a way that reflects the abstract idea. So can you help me understand? Because, do you see my problem? My problem is that you could narrow down any claim to a single element, and then describe it in an abstract way, and that would then, every claim would automatically satisfy Alice step one. This is a publishing system, and the ultimate result of it is conversion of a file and publication of it. And yet, you say this claim is all about the abstract idea of authentication, which is absolutely one element. But this is my problem, so help me figure out how to work through what you're saying. I understand the court's concern, and that the court must look at the claim as a whole. And I would say this is very similar to TLI. In TLI, there were elements of the claim that were directed, for example, to having a telephone unit, and to having messages be sent into the system via the telephone unit, with the photographs then being characterized based on identifying information. The court nevertheless found that that was, that the claim as a whole was directed to an abstract idea, because the core of the claim was this categorization, and then there were routine known elements, but physical elements, like having the telephone unit, that, well, so I don't think that the physical elements detract from the concept of the abstract idea, because the abstract idea is the idea that's being effectuated on these physical elements. But what, and so that's why I don't think this is like TLI. What I, maybe your argument should be, which it hasn't been, two abstract ideas doesn't save it from being abstract. I don't know. You know, the fact that there are three different, you know, there's authenticate, convert, and publish. There's clearly three major components to this claim, and you'd like to sum it all up in terms of just one, and that doesn't, it's not sitting well for me with the abstract idea notion, because every other case that I've encountered, the abstract idea articulates the abstraction that is the entire method being performed, and you seem, I'm just really worried. I mean, the Supreme Court cautioned us, against narrowing it down to a single element and doing it that way, because then everything would be abstract, and I do think that's true. I understand. I would say in TLI, there was a requirement also of receiving information, that the information be sent to the system where it would then be classified. So one could look at the claim in TLI and say there was a receiving idea that was. What was the abstract idea in TLI? Well, the abstract idea was the categorization of the information. It was the classification of the information. But do you understand you have to receive information to classify it, and it's all part of the same thing. Here, there's authentication. Then there's a totally, totally different conversion process that takes place, which is independent of authentication and has no relevance to it, and then there's a publication step, which likewise, you could certainly authenticate, and you can convert without ever publishing. In TLI, you can't categorize without receiving the information. It's all connected in TLI as a single entity, and that's why it makes sense that it's a single umbrella abstract idea. I'm just struggling with how do I articulate the abstract idea, and as I said before, maybe there are two or three, but I... I would suggest here that the authentication is sort of bound up with publishing. It is authentication for the purpose of publishing. That is the reason that you are performing the authentication step, and that conversion is inherent in the notion that what we are doing here is this step of authenticating for publication, something to be published on the web. And so I understand, I think as in TLI, there are different concepts, but I think here, these are concepts are linked, and when we look at the claim, there's no detail, there's no specificity, there's nothing technological that is set forth in the claim with respect to conversion or publication. What is set forth in the claim with specificity is this either means for identifying or identifying step that relates to this security scheme. I also think under this court's precedent, the court can look to what the specification sets forth as being the novel feature of the invention, which in the distinction over Bobo is described as being this security scheme. To have it, this is like, it's almost as though you wanna return me to the world of the gist or heart of the invention pre-1952 and use that as the basis for invalidating claims. I mean, the legislature said that's no good 70 years ago. I don't, I'm really not comfortable with the idea that I should extract from the claim the most novel element and then decide whether that's abstract or not. That makes me feel very uncomfortable as a rule of law. I understand, but I would suggest that it is permissible to look to the specification to understand the invention that is being claimed for purposes of the 101 analysis. I do wanna make sure that I have time to address any questions. I would have thought that your argument would have been that looking at the claims as a whole, the notion of converting information from one format to another is abstract also. Well, it certainly is. I think that is, I think that is a reasonable way to look at it, Your Honor. I also do think that. Particularly when we look at these claims, which does not give any detail on how the conversion is done. And even once you get to the specification, I think just refers to conventional methods of conversion. There is not a new algorithm or method for doing the data conversion, is there? That is absolutely correct, Your Honor. There is nothing that is indicated as being anything other than conventional with respect to the technological accoutrements of the claim. It's a central processor, there's a sender account, and there is some method, there's a step of conversion. But there is nothing that is specified with respect to how that is done or any indication that it would itself be novel. This is where I tried to get you to go at the outset, but I couldn't get you there. I'm glad that Judge Huston, I said, maybe this is a case where there are two abstract ideas or three instead of one. And does that make it any less abstract? You weren't biting with me, but I guess he did it more effectively than I did. I did not mean to suggest that that would not be the case. And certainly to the extent that that is considered a separate idea, it would, I agree, be an abstract one. There's nothing concrete about it. With respect to the infringement issues, I did briefly touch on the format issue. There is also the issue of the central processor. And the notion that that element has been claimed in entirely functional terms. EasyWeb's construction is such that any computer or set of computers satisfies that limitation. And there would be no universe in which the specific requirements that particular steps be performed by the central processor would not be satisfied. Because the central processor is defined entirely recursively to be any computer or set of computers that does anything. Not only does that effectively vitiate the claim elements that require software in the central processor to perform particular functions in particular claims, but the specification distinguishes between the central processor and the internet server. And under EasyWeb's proposed construction, that distinction would make no difference because any computer would form part of the central processor. Unless the court has any further questions, I will see the remainder of the meeting. Thank you, Ms. Dury. Thank you. Mr. Kelman has some rebuttal time. Let me address the question with regard to multiple abstract ideas that Judge Moore and Judge Hughes raised. If we distill claims down to every little piece of them and then, say, taking multiple and say each one of the little individual things in there is abstract, and then say, well, you add them all together, you now have an abstract idea, then I think we can probably do that with just about every single claim, depending on how much you divide it. We have to step back and understand what is the technological problem that's there. The problem is, how do I publish information on the web? It sounds easy today. We're sitting in 2017. That wasn't what you said was the problem in your spec, though. The problem that you identified in your spec was all about authentication. It didn't seem to be. Where do you identify the problem at a real level is how to publish on the web? I mean, that you seem to acknowledge in the spec itself is already known if people know how to publish stuff on the web. Well, right, OK. So I apologize. So the idea in the specification is permitting people to publish. It is true, right? An individual who has knowledge about how to design a web page can certainly have done that before. There's no disagreement on that. The purpose of the invention was to enable others through means that they had at their disposal to start publishing on the web. It's a paradigm shift in the way web publishing at that time was done. At the time, you had to have a knowledgeable web author, essentially, or pay for one of them.  Now, how it's done, it's not a complicated process. I'm not suggesting that it's there, but it's a real unique way of approaching that problem, where you have to deal with the issue of it's coming from multiple different places. So it's not just coming from a phone. It's not just coming from a computer. How do I deal with that situation? Well, Mr. Carignano deals with that situation by looking at the format of the message that's coming in. That's a novel thing to be done. There's actually nothing in the record, even though Twitter constantly says over and over again, looking at the format of a message in order to authenticate or identify was somehow commonplace. There's nothing in the record to support that other than a statement by their expert that it was because of this Freistadt reference. But the Freistadt reference, first of all, doesn't say that. And second of all, the Freistadt reference is a patent that we're talking about here. It was a new and novel thing just slightly before the easy one. I don't understand how you're arguing this is not conventional. Your argument boils down to it's not conventional to identify a user by virtue of their phone number or fax number. That is not my argument. Yes, it is. Because this patent discloses identifying the user not with a special password or any sort of account, but rather by recognizing the fax number. It's one of the examples given in the patent. Recognizing the fax number and knowing that this fax number is authorized to use this publishing software. So you're saying to me that the non-conventional aspect is to recognize that a fax number corresponds to a unique individual. No, I'm not saying that. What I'm saying is that non-conventional aspect of this is recognizing who it is from a multitude of different types of information coming in. So for example, in the example that you just gave. In the case of a fax, the fax number is the method of identification. Sure, that's one way to do that. There are other ways. And so you're saying that what's not conventional is identifying an authorized user by virtue of their fax number. I don't know, I had a caller ID in 2009. I understand that, and let me try to address that issue. What's non-conventional here is not the fact that there's a caller ID or that you can read a fax header. The non-conventional thing is that when systems were accepting and authorizing individuals at the time, back in that time frame, they would do it, suspect talks about, with a passcode. That would be sort of a uniform way to do it. The idea of changing the way you authenticate, changing it based on the different types of messages that are coming in, that's the non-conventional thing. And there actually is nothing in the record, as I said, short of this Freistadt reference, that suggests that that was conventional, the idea of changing it depending on what it was. Thank you, counsel. We'll take the case under advisement. All rise. The Honorable Court is adjourned until this afternoon at 2 o'clock. Okay.